**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| THE DESA GROUP, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No.:    15-0411 (RC) |
| | : | |
| v. | : | Re Document Nos.:   14, 20 |
| | : | |
| U.S. SMALL BUSINESS | : | |
| ADMINISTRATION, | : | |
| | : | |
| Defendant. | : | |

**MEMORANDUM OPINION**

**GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT; AND DENYING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

Plaintiff The Desa Group, Inc. ("TDG") initiated this action under the Administrative

Procedure Act ("APA"), 5 U.S.C. §§ 701 *et seq.*, alleging that Defendant the United States Small

Business Administration ("the SBA") acted arbitrarily and capriciously in terminating TDG from

a preferential contracting program for socially and economically disadvantaged small businesses,

called the Section 8(a) Business Development Program ("the Section 8(a) program").  To be

eligible for the Section 8(a) program, a business must be "unconditionally owned and controlled

by one or more socially and economically disadvantaged individuals."  13 C.F.R. § 124.101.  A

non-disadvantaged entity or individual may be found to control a business, however, when

"[b]usiness relationships exist with non-disadvantaged individuals or entities which cause such

dependence that the applicant or Participant cannot exercise independent business judgment

without great economic risk."  *Id.* § 124.106(g)(4).  TDG is run by Dionne Fleshman and Ms.

Fleshman's mother, Diane Sumpter, runs a separate company, DESA, Inc., that graduated from

the Section 8(a) program in 1997.  At times, the two firms have contracted or subcontracted with one another, and their business enterprises appear to be connected in various other ways.  The SBA terminated TDG from the Section 8(a) program after the agency concluded that the connections between TDG and DESA indicated that TDG was unduly dependent on DESA.[1]

TDG does not dispute that there are contacts between the two firms.  But the company claims that the SBA acted arbitrarily and capriciously in determining that those connections indicate business relationships that cause TDG to be so dependent on DESA that TDG is unable to exercise its own independent business judgment without great economic risk.  *See, e.g.*, Pl.'s Mem. P. & A. Supp. Mot. Summ. J. at 9 ("Pl.'s Mem. Supp."), ECF No. 14-1.  After a thorough review of the record, the Court agrees that the SBA has failed to articulate a rational connection between the evidence in the administrative record and its conclusion that TDG is unduly dependent on DESA.  Accordingly, the Court will grant TDG's motion for summary judgment and will deny the SBA's cross-motion for summary judgment.

## II.  FACTUAL BACKGROUND

### A.  Statutory and Regulatory Background

Section 8(a) of the Small Business Act authorizes the SBA to enter into procurement contracts with the federal government, and then subcontract the SBA's performance of those contracts to a "socially and economically disadvantaged small business."  15 U.S.C. §

---

[1] As noted, Ms. Sumpter and DESA had previously participated in the Section 8(a) program.  The SBA's regulations provide that "[o]nce a concern or disadvantaged individual upon whom eligibility was based has participated in the 8(a) BD program, neither the concern nor that individual will be eligible again."  13 C.F.R. § 124.108(b).  Furthermore, "[a]n individual who uses his or her one-time eligibility to qualify a concern for the 8(a) BD program will be considered a non-disadvantaged individual for ownership or control purposes of another applicant or Participant."  *Id.* § 124.108(b)(3).

637(a)(1)(A)–(B).  The Section 8(a) program is intended "to assist eligible small disadvantaged business concerns [to] compete in the American economy through business development."  13 C.F.R. § 124.1.  To administer the Section 8(a) program, the SBA has promulgated regulations which set forth, among other things, the program's eligibility requirements.  *See generally* 13 C.F.R. §§ 124.1 *et seq.*  In order to be eligible for the Section 8(a) program, a business must be "a small business which is unconditionally owned and controlled by one or more socially and economically disadvantaged individuals who are of good character and citizens of and residing in the United States, and which demonstrates potential for success."  *Id.* § 124.101.  The regulations further specify those circumstances in which a business will or will not be considered "controlled" by a socially and economically disadvantaged individual.  Of most relevance to this case, a participating business "must be managed on a full-time basis by one or more disadvantaged individuals who possess requisite management capabilities."  *Id.* § 124.106(a)(1).  Despite such management, "[n]on-disadvantaged individuals or entities may be found to control or have the power to control" a business in certain circumstances, including when "[b]usiness relationships exist with non-disadvantaged individuals or entities which cause such dependence that the applicant or Participant cannot exercise independent business judgment without great economic risk."  *Id.* § 124.106(g)(4).

A business that is admitted to the program may participate for a term of nine years.  *See id.* § 124.2.  During its participation, the business must "maintain its program eligibility" and "must inform SBA of any changes that would adversely affect its program eligibility."  *Id.*  Moreover, a business may be terminated from the program prior to the expiration of the nine-year term "for good cause."  *Id.* § 124.303(a).  Among the examples of good cause listed in the SBA's regulations are a business' failure "for any reason . . . to maintain ownership, full-time

day-to-day management, and control by disadvantaged individuals," or a business' failure "to disclose to SBA the extent to which non-disadvantaged persons or firms participate in the management of the Participant business concern." *Id.* § 124.303(a)(3), (a)(5).

## B. TDG's Participation in the Section 8(a) Program

TDG contracts with federal and state agencies, as well as private corporations, to provide "conference support services." Compl. ¶ 8, ECF No. 1. TDG was certified as a participant in the Section 8(a) program on September 30, 2010, for a nine-year term that was slated to end in September 2019. *See* A.R. 140; Compl. ¶ 13. TDG was deemed eligible for the program based on the status of the company's President and CEO, Dionne Fleshman, as a "disadvantaged individual" as defined in the Small Business Act. *See* A.R. 377. Ms. Fleshman's mother, Diane Sumpter, runs a separate, but similarly named, company: DESA Inc. ("DESA"). *See id.* at 169, 195. Ms. Sumpter and DESA were previously participants in the Section 8(a) program, and DESA graduated from the program in March 1997. *See id.* at 169. Shortly before TDG was approved as a Section 8(a) participant, the SBA contacted Ms. Fleshman to ask, among other things, whether "any immediate family members own a business and/or have ever participated in the 8(a) program." *Id.* at 193. Ms. Fleshman responded, via email, explaining that her mother, Ms. Sumpter, "owns the company, DESA, Inc., which graduated from the 8(a) program about 13 years ago in 1997." *Id.* at 195. Ms. Fleshman further asserted that TDG "has no dependence on DESA, Inc., other than the company being one of my customers," and disclosed that during the 2010 calendar year "revenues from DESA, Inc. amount to slightly less than 25% of my company's revenues," but that TDG and DESA "have no common directors, no common officers, no common shareholders and no common employees" and are located at "separate physical locations." *Id.*

On October 11, 2012, the SBA's Office of Program Review ("OPR") received a complaint on its tip hotline which alleged that Ms. Fleshman did not work full-time for TDG, but worked at both TDG and DESA. *See id.* at 169. The complainant further claimed that DESA's CEO, Ms. Sumpter, was "doing the real managing at [TDG]."[2]  *Id.* After receiving the complaint, Solomon Wheeler, a member of the OPR staff, conducted a review of TDG's continued eligibility to participate in the Section 8(a) program. As part of that review, Mr. Wheeler sent Ms. Fleshman a November 7, 2012 letter posing a series of questions and directing Ms. Fleshman to provide responses and, in some cases, documentation. *See id.* at 316–17. Ms. Fleshman responded to the letter on November 27, 2012. *See id.* at 181–85; *see also id.* at 186–315 (reproducing attachments). After reviewing Ms. Fleshman's responses, and as a result of its investigation, OPR ultimately recommended that the SBA South Carolina District Office ("SCDO") issue a letter of intent to terminate TDG from the Section 8(a) program. *See id.* at 169–75.

On February 14, 2013, the SCDO sent a letter to Ms. Fleshman informing her that the SBA intended to terminate TDG's participation in the Section 8(a) program. *See generally id.* at 428–40. That letter set forth approximately a dozen grounds that the SCDO claimed established good cause to terminate TDG from the Section 8(a) program. *See id.*; *see also* 13 C.F.R. § 124.303(a)(1)–(20) (detailing examples of "good cause"). Because several grounds were abandoned by the SBA in its answer to TDG's appeal, *see* A.R. 379 n.2, rejected by the SBA

---

[2] TDG complains that the December 14, 2012 memorandum in the record that sets forth the hotline complaint, *see* A.R. 169, is not contemporaneous with the October complaint, and that TDG has "never received any contemporaneous document regarding a 'hotline complaint,'" Pl.'s Opp'n & Reply at 2 & n.2, ECF No. 26-2. The Court considers this fact irrelevant. The record makes plain that the SBA's decision to terminate TDG from the Section 8(a) program was not made on the basis of the anonymous complaint, itself, but was made on the basis of the factual record developed subsequent to, and as a result of, that complaint.

Office of Hearing Appeals ("OHA") administrative law judge ("ALJ"), or not reached by the

ALJ, the Court will detail only on those grounds that remain relevant to this action.[3]

Citing 31 C.F.R. § 303(a)(3), the SCDO claimed that Ms. Fleshman did not manage TDG

full time and, therefore, that TDG had failed "to maintain ownership, full-time day-to-day

management, and control by disadvantaged individuals." *Id.* at 431. Among other factors, the

SCDO claimed that TDG's invoices showed Ms. Fleshman had been paid "roughly $7,712 to

$10,000 per month from [DESA]," which the SCDO posited made it "unfeasible for you to be

working full-time to cover TDG's other contract performance obligations." *Id.* The SCDO also

argued that many of TDG's 2012 invoices "show [DESA] as the subcontractor, an indication that

[DESA] rather than TDG is managing the contracts," and that, prior to relocating, TDG was

"housed within [DESA]'s headquarters," in a "private office not segregated from [DESA]." *Id.*

---

[3] For example, the SBA alleged that Ms. Fleshman knowingly submitted false information in her application when she failed to disclose a 1991 misdemeanor charge for passing fraudulent checks. *See* A.R. 429, 388. The ALJ rejected this ground, however, and held that the SBA had failed to consider whether Ms. Fleshman made an honest and reasonable mistake about the charge because she "disputes that she was ever arrested and maintains that she had no further interactions with the judicial system after paying the amount of the bounced check." *Id.* at 380. Similarly, in September 2010, and around the time TDG submitted its application, Ms. Fleshman had represented that TDG earned slightly less than 25% of its income through its contracts with DESA. *Id.* at 195, 430–31. Although that figure turned out to be closer to 40% for the 2010 calendar year, the ALJ rejected the SBA's determination that Ms. Fleshman had misrepresented the figure. The ALJ pointed out that "the SBA asked for and received a snapshot of [TDG's] finances, so it had no reason to believe the figures represented a final yearly tally," and further found that the SBA had supplied no evidence indicating that Ms. Fleshman knew in September 2010 that the figure would be significantly higher by year's end. *Id.* at 381. The ALJ also rejected the SBA's fanciful suggestion that because DESA and TDG were "connected" on social media networks like Facebook and LinkedIn, the record indicated DESA controlled TDG or that Ms. Fleshman did not work full-time for TDG. As the ALJ explained, "[t]he SBA points to nothing in either company's LinkedIn or Facebook profiles that indicates a power structure," and that any "exercise of control could run in either direction, or not at all." *Id.* at 382. Finally, because it found one ground sufficient to uphold the SBA's determination, *id.* at 384, the ALJ did not reach the numerous other grounds that SBA had alleged as good cause for TDG's termination, *see id.* at 432–39.

Citing the same regulation, the SCDO also claimed that "[s]everal facts indicate that Ms. Sumpter has control or has the power to control TDG's business relationship such that [Ms. Fleshman] cannot exercise independent business judgment without great economic risk." *Id.* at 432. The SCDO again pointed to the fact that many of TDG's invoices showed DESA as the subcontractor, and also noted that Ms. Fleshman had listed Ms. Sumpter as a sub-contractor on TDG's 2011 payroll listing. *Id.*; *see also id.* at 287. Similarly, the SCDO alleged that TDG had not fully disclosed the extent of Ms. Sumpter's participation with TDG, circumstances which the agency claimed established good cause under 13 C.F.R. § 124.303(a)(5) for failure "to disclose to SBA the extent to which non-disadvantaged persons or firms participate in the management of the Participant business concern." *Id.* at 433. The SCDO stated that it had "met numerous times with TDG, including the firm's initial 8(a) orientation on 10/26/10," and "[i]n every instance Diane Sumpter has been present and was very active in conversations." *Id.* at 433–34.

On the basis of these and other grounds detailed in its letter, the SCDO informed Ms. Fleshman that it "intends to terminate The Desa Group, Inc., with good cause from the 8(a) Business Development Program," and that Ms. Fleshman had "30 days from the day of receipt of th[e] Letter of Intent to Terminate to submit a written response." *Id.* at 439.

On March 19, 2013, Ms. Fleshman responded with a lengthy letter, refuting the SCDO's contentions. In particular, she claimed that the SCDO had mischaracterized the relationship between TDG and DESA when the agency relied on the invoices listing revenues from DESA as grounds to conclude that Ms. Fleshman was not dedicating her full-time employment to TDG. *Id.* at 105. She explained that DESA "is one of TDG's clients," and therefore, "[a]s head of TDG, I am working on a full-time basis delivering services to all of my clients and fulfilling my contractual obligations." *Id.* at 105–06. Moreover, she argued that far from listing "many"

invoices showing DESA as a subcontractor, Ms. Fleshman asserted that there existed only a

"single project where [DESA] is a subcontractor of TDG," and for which DESA "only performs

about 16% of the work as a subcontractor." *Id.* at 106, 108.  With respect to the firm's location,

Ms. Fleshman noted that TDG had relocated and had not been housed in the same location as

DESA "since before it was admitted to the 8(a) Program," and that, even while it was located at

the same address, TDG's office was "segregated from [DESA]." *Id.* at 106–07.  Finally, Ms.

Fleshman maintained that Ms. Sumpter was listed not as an employee but as "a 1099

independent contractor for the delivery of marketing services." *Id.* at 108.

Over a year later—on July 31, 2014—the SBA's Office of Business Development

responded to Ms. Fleshman's letter and concluded that, "[b]ased on a thorough review of the

information submitted in response to the proposed termination action, . . . the reasons cited for

termination have not been overcome." *Id.* at 387.  The SBA responded to and rejected each of

TDG's contentions, and informed TDG that the company would be terminated from the Section

8(a) program unless it filed an appeal within 45 days with the SBA's Office of Hearings and

Appeals ("OHA"). *Id.* at 388–409.

TDG did file an appeal, and the ALJ issued his decision on February 5, 2015.  As

pertinent to this action, the ALJ rejected SBA's claim that Ms. Sumpter controls, or has the

ability to control, TDG.  *See id.* at 381–83.  As the ALJ explained, "[i]n many instances, the

Termination Letter identified a real or perceived business connection between [TDG] and DESA,

[and] then made a conclusory statement that the connection was indicative of shared

management, improper reliance, or lack of full-time dedication to [TDG]," but had "rarely

attempted to explain how the evidence supported the conclusion." *Id.* at 382.  Specific to the

SBA's contentions regarding TDG's earnings from DESA, the ALJ found that the SBA's

conclusion that "Ms. Fleshman is an employee of DESA" was "contrary to the evidence" because "Ms. Fleshman is not employed directly by DESA," and the invoices merely show payments made to TDG "pursuant to its subcontract with DESA," which were not "Ms. Fleshman's personal income." *Id.* at 383.

At the same time, however, in the final three paragraphs of his opinion, the ALJ noted that control by a non-disadvantaged individual may be found where "'business relationships exist . . . which cause such dependence that the applicant or participant cannot exercise independent business judgment without great economic risk.'" *Id.* at 383 (quoting 13 C.F.R. § 124.106(g)(4)).  The ALJ concluded that, while the "examples cited in [SBA's] Termination Letter may not be persuasive evidence of actual control by Ms. Sumpter, . . . they are evidence of significant interconnectedness between the two companies." *Id.*  The ALJ then cited several factors which he found demonstrated such interconnectedness, including: (1) that "[b]oth companies act or have acted as subcontractors for the other company"; (2) that TDG "maintains an office in DESA Inc.'s headquarters in order to more effectively manage its contractual obligations to the elder company"; (3) that TDG's "own headquarters is in a building owned by Ms. Sumpter"; (4) that TDG "holds meetings in DESA's building, and Ms. Sumpter is a vocal participant in those meetings"; (5) that, regardless of whether Ms. Sumpter was acting as TDG's "marketing contractor or as its manager," it was "clear that Ms. Sumpter plays a critical role in [TDG's] success"; (6) that "DESA was responsible for almost 40% of [TDG's] revenues in 2010"; and (7) that DESA was paying TDG "between $7,000 and $10,000 per month from 2010 to 2012." *Id.* at 383–84.  Overall, the ALJ concluded that "SBA has provided evidence that rationally supports its ultimate conclusion" that TDG "could not risk its relationship with DESA

without substantial harm to its own health." *Id.* at 384.  Therefore, the ALJ found that the SBA

had "articulated a reasonable basis" for terminating TDG from the Section 8(a) program.  *Id.*

TDG subsequently filed this action under the APA, challenging the SBA's decision to

terminate it from the program.  *See* Compl. ¶¶ 25–30.  Count I alleges that the SBA's decision

was arbitrary, capricious, and contrary to law.  *Id.* ¶ 27.  Count II alleges that the SBA's

determination violated the Small Business Act and its implementing regulations because the

SBA terminated TDG without the necessary good cause and because the SBA violated its own

regulations when it failed to respond for over a year to TDG's response to the agency's letter of

intent to terminate.  *See id.* ¶¶ 29–30.  The SBA's regulations provide that: the "SBA will act in a

timely manner in processing early graduation and termination actions."  13 C.F.R. § 124.304(c).

TDG has now moved for summary judgment (ECF No. 14), and the SBA has cross-

moved for summary judgment (ECF No. 20).

## III.  LEGAL STANDARD

A court may grant summary judgment when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  When assessing a motion for summary judgment in an APA case, however,

"the district judge sits as an appellate tribunal."  *Am. Bioscience, Inc. v. Thompson*, 269 F.3d

1077, 1083 (D.C. Cir. 2001).  In such cases the complaint "actually presents no factual

allegations, but rather only arguments about the legal conclusion to be drawn about the agency

action."  *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993).

Therefore, "[t]he entire case on review is a question of law, and only a question of law."  *Id.*  The

Court's review "is based on the agency record and limited to determining whether the agency

acted arbitrarily or capriciously," *Rempfer v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009), or in violation of another standard set out in section 10(e) of the APA, *see* 5 U.S.C. § 706.

The scope of a court's "arbitrary and capricious" review "is narrow" and "a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 43 (1983). To satisfy the standard, an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). An agency's action is arbitrary and capricious if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

Agency fact finding, even in an informal adjudication, "must be supported by substantial evidence—otherwise it would be arbitrary and capricious." *Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007); *accord Ardmore Consulting Grp., Inc. v. Contreras-Sweet*, 118 F. Supp. 3d 388, 394 (D.D.C. 2015) (applying the substantial evidence standard in a case reviewing a Small Business Association decision where the plaintiff "seeks to overturn several of the SBA's factual findings"). "When the arbitrary or capricious standard is performing that function of assuring factual support, there is no substantive difference between what it requires and what would be required by the substantial evidence test, since it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense." *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 745 F.2d 677, 683–84 (D.C. Cir. 1984) (emphasis omitted). Substantial evidence is "such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). An agency decision "may be supported by substantial evidence even though a plausible alternative interpretation of the evidence would support a contrary view." *Morall v. Drug Enf't Admin.*, 412 F.3d 165, 176 (D.C. Cir. 2005) (quoting *Robinson v. Nat'l Transp. Safety Bd.*, 28 F.3d 210, 215 (D.C. Cir. 1994)). At the same time, however, substantial evidence requires "more than a scintilla," and an agency "must do more than create a suspicion of the existence of the fact to be established" to satisfy the standard. *Id.* (quoting *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 299–300 (1939)). And "[a]s the Supreme Court has explained," the "substantiality of evidence must take into account whatever in the record fairly detracts from [the evidence's] weight," and a court "may not find substantial evidence 'merely on the basis of evidence which in and of itself justified [the agency's decision], without taking into account contradictory evidence or evidence from which conflicting inferences could be drawn.'" *Lakeland Bus Lines, Inc. v. NLRB*, 347 F.3d 955, 962–63 (D.C. Cir. 2003) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487, 488 (1951)).

## IV.  ANALYSIS

The SBA's letter of intent to terminate TDG from the Section 8(a) program raised approximately a dozen grounds for terminating the firm. Yet, by virtue of the ALJ's rejection of several grounds on appeal, and the fact that the ALJ only upheld the decision on one ground, the issue now before this Court is exceedingly narrow: whether the SBA acted arbitrarily and capriciously in concluding that "[b]usiness relationships exist" between TDG and "non-disadvantaged individuals or entities which cause such dependence that" TDG "cannot exercise independent business judgment without great economic risk." 13 C.F.R. § 124.106(g)(4).

The ALJ listed various circumstances that, in his view, established "significant interconnectedness" between TDG and DESA.  *See* A.R. 383–84.  The SBA relies on these circumstances, but also invokes several additional connections that the ALJ did not rely upon, but that the agency had raised in its termination letters.  *See* Def.'s Mem. Supp. Cross-Mot. Summ. J. & Opp'n Pl.'s Mot. at 14 ("Def.'s Mem. Supp."), ECF No. 20; *see also* A.R. 51, 402–03, 434.  After a thorough review of the administrative record, however, the Court concludes that both the ALJ and the SBA have failed to articulate or explain how those connections—even if significant or substantial—demonstrate such a high level of dependence that TDG "cannot exercise independent business judgment without great economic risk."  13 C.F.R. § 124.106(g)(4).  Therefore, the Court finds that the agency has failed to articulate "'a rational connection between the facts found and the choice made,'" and has also "failed to consider an important aspect of the problem."  *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168).  The Court will discuss each putative connection in turn.

First, the ALJ asserted that TDG "maintains an office in DESA Inc.'s headquarters in order to more effectively manage its contractual obligations to the elder company."  A.R. 383.  This assertion is problematic in two ways.  As the Court will explain, there is considerable dispute in the record concerning whether TDG continues to have an office at DESA's headquarters at all.  Even if TDG does continue to maintain an office there, however, the SBA has failed to explain why that connection indicates that TDG is unable to exercise independent business judgment without great economic risk.

In its initial letter of intent to terminate, the SBA had claimed that before the firm relocated to its current location—1515 Richland Street—TDG "was housed within [DESA]'s

headquarters at 400 Percival Street," in a private office "not segregated from" DESA and where

the firms appeared to share a receptionist. *Id.* at 431.  Ms. Fleshman responded by asserting that

TDG has not had its corporate office located at 400 Percival Street . . . since before it was

admitted to the 8(a) program," and that the company never had a receptionist. *Id.* at 106–07.

Ms. Fleshman did note that TDG's own headquarters at 1515 Richland Street was housed in a

building owned by Ms. Sumpter or DESA, but claimed that the arrangement was intended to

facilitate TDG's performance of human resource management services for DESA and to protect

"the very sensitive nature of the personnel records involved." *Id.* at 111.   In its subsequent

response, the SBA amended its allegation to assert that, although TDG does maintain its own

headquarters at 1515 Richland Street, it "appears that TDG has an office at 400 Percival Street."

A.R. 395.  In doing so, the agency seems to have erroneously read Ms. Fleshman's response as

admitting that TDG continued to maintain an office at DESA's headquarters. *See id.*[4]  And the

SBA also claimed that a Business Opportunity Specialist for the SCDO had visited DESA's

headquarters on two occasions unrelated to TDG business, once on an unspecified date and

another on February 1, 2011, "after TDG's certification," and allegedly "observed [TDG's]

office within the [DESA] headquarters building." *Id.*  On these bases, the SBA concluded that

---

[4] The SBA quoted only the following statement from Ms. Fleshman's response as support for its contention that TDG "has an office" in DESA's headquarters: "However, there was no separate entrance." A.R. 395.  But when read in its full context, it is apparent that Ms. Fleshman made no such admission.  Ms. Fleshman wrote that: "TDG has not had its corporate office located at 400 Percival Street, Columbia, SC since before it was admitted to the 8(a) Program.  However, there was 'no separate entrance' at 400 Percival Street from the outside because the building was constructed that way." *Id.* at 106–07.  Ms. Fleshman further stated that "TDG's private office was indeed segregated from [DESA] *while TDG was located at that address*." *Id.* at 107 (emphasis added).  Read in context, the letter indicates that Ms. Fleshman was explaining—in the past tense—the location of its office when it had previously been located in the same building as DESA's headquarters. *See id.* at 106–07.  The Court perceives no basis for the SBA's conclusion that Ms. Fleshman had admitted TDG continued to have an office at DESA's headquarters.

"having [TDG's] office in [DESA's] headquarters and sharing the receptionist represents additional evidence of affiliation, management and control" between TDG and DESA. *Id.*

Thus, it appears that the ALJ may have misread the record when he concluded that TDG kept an office *at DESA's headquarters* "in order to more effectively manage its contractual obligations" to DESA. *Id.* at 383. Neither party made that exact claim. The SBA made no allegation beyond the existence of the office, and TDG claimed that its *own headquarters* in a DESA-owned building was intended to facilitate its human resource responsibilities for DESA. Oddly, however, in its briefing before this Court TDG now appears to accept—or at least does not definitively dispute—that TDG "maintains an office in DESA Inc.'s *headquarters*," even though TDG cites to its response to the SBA's letter in which Ms. Fleshman was clearly referencing TDG's habitation of the separate DESA-owned building at 1515 Richland Road. Pl.'s Mem. Supp. at 12 (emphasis added). Like the ALJ, TDG now seems to conflate its response to the SBA's claim that its offices are located in a DESA-owned building with the SBA's distinct allegation that TDG maintains an office at DESA's headquarters. This discrepancy is puzzling.[5]

---

[5] In some ways, the SBA also compounds this discrepancy by now outright accepting and relying on Ms. Fleshman's claim that TDG's headquarters is not located in the same building as DESA's headquarters. The SBA now claims that because "the administrative record indicates that DESA's headquarters are located at a different location," the firm's "explanation that it is located in a DESA satellite office to facilitate an HR function . . . raises more questions than answers." Def.'s Mem. Supp. at 16. The agency notes that TDG is under contract to provide human resources services for a number of clients, but that the firm does not claim that it keeps offices at any of its other clients' locations. *Id.* The agency's change in emphasis places TDG in somewhat of a catch-22: under the ALJ's and SBA's original view, having an office at DESA's headquarters indicated dependence, but the SBA now claims that the fact that TDG does *not* have an office there undermines TDG's explanation for any connection between the two locations. In any event, and for the reasons stated below, the discrepancies in the record do not change the Court's conclusion that the agency has failed to articulate how the location of TDG's headquarters or satellite office suggests that TDG is unable to exercise independent business judgment without great economic risk.

Regardless of whether TDG in fact maintains an office at DESA's headquarters, however, TDG contends that the SBA and ALJ failed to explain why having an office in DESA's headquarters caused "such dependence on TDG that it cannot exercise independent business judgment without great economic risk." Pl.'s Mem. Supp. at 12 (quoting 13 C.F.R. § 124.106(g)(4)). The SBA does little to answer this contention. Indeed, the agency simply contends that TDG's office locations "were not considered in isolation but were among several other factors that establish an unusual closeness between these two companies." Def.'s Mem. Supp. at 16. But, in doing so, the agency wholly fails to explain how any closeness demonstrated by TDG's location indicates that TDG is unable to exercise independent business judgment without risk to its success.

The ALJ also relied on the fact that TDG's own headquarters were located in "a building owned by Ms. Sumpter." A.R. 383. In a footnote of TDG's memorandum in support of its motion for summary judgment, TDG argues that "OHA overlooked the fact that TDG has a commercial lease for its space and is paying a market rate," and claims that "OHA gave no reason why this fact would make TDG dependent on DESA." Pl.'s Mem. Supp. at 18 n.4. Beyond again referring to this fact as simply one, among several, that the ALJ relied upon (and without explaining how the fact rationally supports its ultimate conclusion), *see* Def.'s Mem. Supp. at 13, 15–16, the SBA does not respond to this argument, contest TDG's claim that it pays a market rate for rent, or further explain why the location of TDG's headquarters in a DESA-owned building indicates that TDG is unable to exercise independent business judgment. Indeed, the agency seems to now urge that any economic benefit TDG receives from the location is irrelevant. *See* Def.'s Reply Supp. Cross-Mot. Summ. J. at 9 ("Def.'s Reply"), ECF No. 28 ("The issue raised, however, is not the amount being paid but the co-location itself that indicated

that TDG could not risk its relationship with DESA. The location of TDG was presented as one of several examples to show the unusual interconnectedness of the two businesses and the opportunity for the assertion of control and influence by Ms. Sumpter over her daughter's business."). But if TDG *is* paying a market rate, and therefore appears no better off than the firm would be if it were to rent any other commercial space in Columbia, the Court agrees with TDG that it is difficult to see how this fact rationally supports the agency's conclusion that there is sufficient interconnectedness such that TDG cannot exercise independent business judgment without great economic risk. At the very least, the SBA has failed to explain why the mere presence of TDG in a building owned by DESA supports its conclusion.

Second, the ALJ concluded that TDG "holds meetings in DESA's building, and Ms. Sumpter is a vocal participant in these meetings," noting that the parties "debate whether Ms. Sumpter's presence in these meetings is as [TDG]'s marketing contractor or as its manager."[6] A.R. 383. These findings invoke the SBA's contentions that members from the SDCO "met numerous times with TDG, including the firm's initial 8(a) orientation on 10/26/10" and that "in every instance Diane Sumpter has been present and was very active in conversations, etc." *Id.* at 433–34. The SBA also claimed that a field visit was conducted on October 25, 2011 by two members of the SBA's Business Opportunity Specialists, during which "Ms. Sumpter guided and was very involved in the discussions." *Id.* at 434. TDG admits that the SBA has had three

---

[6] Yet another discrepancy appears to have been caused by the ALJ's lack of precision. Although the ALJ referred to meetings held "in DESA's building," A.R. 383, as TDG points out all of the alleged meetings, to the extent there are records of them, were held at TDG's headquarters, Pl.'s Opp'n & Reply at 15. While DESA owns that building, it is not DESA's headquarters, and the ALJ does not indicate whether that distinction mattered to his analysis (or which he referred to). Perhaps in light of this reality, the SBA abandons its reliance on the location altogether. *See* Def.'s Reply at 10 ("[TDG's] argument misses the point. What is most significant is not the location of the meetings but Sumpter's documented conduct during those meetings.").

meetings with TDG, and that Ms. Sumpter was present at each one, but claims that there was nothing problematic about Ms. Sumpter's attendance. *Id.* at 110–11. The SBA responded that at each meeting "Ms. Sumpter was not only present but apparently in charge," and that "[o]n all three occasions Ms. Sumpter was directing the conversations and questions." *Id.* at 399.

When pressed during the appeal to the OHA, the SBA was only able to produce three records of such meetings—two field visit reports and an e-mail from a DESA employee requesting a meeting between TDG, DESA, and the SBA to discuss a possible joint venture between the firms. *See id.* at 341, 348–62. Although SBA claims it "satisfactorily addressed these concerns prior to OHA's decision," Def.'s Mem. Supp. at 17, the documents the SBA provided do little to corroborate the SBA's putative evidence.

For one thing, the first field visit report lists the "date of visit" as December 8, 2011, not the October 25 date the SBA alleged. *See* A.R. 348. And if one were to think this might be a typographical error, the signatures at the end of the report each date from December 2011, as well. *See id.* at 353. In addition, the report states that it was the "[f]irst official site visit" to TDG, *id.* at 352, which either casts doubt on the SBA's contention that a prior October 2011 site visit took place, or at least leaves the record without any first-hand evidence of such a meeting. Finally, the report itself makes no mention of Ms. Sumpter dominating the conversation or appearing to direct the firm. Quite to the contrary: the report indicated that the firm "was found to be in good stead," listed Ms. Fleshman's educational credentials, and stated that the "principal and part-time assistant appears [sic] to be well qualified and ready to go to work." *Id.* at 352.

In fact, nowhere in the record—beyond the termination letter and its response—are the details concerning Ms. Sumpter's "'take charge' actions," "authority and influence in the meetings," or heavy "involve[ment] in discussions" documented. *Id.* at 399, 434. And the

termination letter and the SBA's subsequent response relating those characterizations of Ms. Sumpter's actions were both signed by officials who had not attended these two field visits, so far as the record indicates.[7]   Thus, the record is devoid of any evidence setting forth personal knowledge of the visits.  *Cf. LaBotz v. Fed. Election Comm'n*, 889 F. Supp. 2d 51, 63 (D.D.C. 2012) (concluding that because an affidavit "is not clearly supported by personal knowledge and is, in fact, contradicted by contemporaneous written evidence," the agency's "conclusion is not supported by 'substantial evidence'").

In addition, the e-mail the SBA added to the record shows that the message was simply a precursor to the second meeting, held on February 4, 2013, which was requested *jointly* by TDG and DESA to discuss a possible joint venture between the two firms.  *See* A.R. 362 (January 31, 2013 e-mail requesting meeting "to discuss Joint Venture Agreement [the firms] wish to submit to the SBA for consideration"); *id.* at 355, 359 (September 4, 2013 field report noting that the SBA was "requested to visit to discuss a possible Joint Venture Agreement between the two firms").  Thus, this e-mail and field visit report together only establish a single, second meeting at which Ms. Sumpter was present, not two additional meetings.  Moreover, because the meeting was called to discuss a joint venture between DESA and TDG, it is unsurprising that Ms. Sumpter, as the owner of DESA, was an active member in the meeting—and the agency fails to explain why it concluded otherwise.

---

[7] At one point, when discussing the October 25, 2011 field visit, the SDCO's notice of intent to terminate states that Ms. Sumpter's actions during that meeting led "Mr. Bryant and *this writer* to perceive Ms. Sumpter was the strongest or at least the primary marketer for TDG." A.R. 434 (emphasis added).  But a mere paragraph previous, the letter stated that the field business was conducted by Floyd Bryant and Mike O'Neill.  *See id.*  By contrast, the letter is signed by Elliott O. Cooper, the SCDO director.  *See id.* at 440.  There is no indication Mr. Cooper, the letter writer, attended the field visit.

While the ALJ did not rely on it, the SBA also references its own discussion of Ms. Sumpter's marketing activities, on behalf of TDG, as an indication that Ms. Sumpter exercised influence over the firm. *See* Def.'s Mem. Supp. at 14; *see also* A.R. 434. Specifically, the SBA contended that Ms. Sumpter has "contacted the SCDO about marketing opportunities" on numerous occasions, that she indicated at one point that she would travel to Washington, D.C. to market TDG to agencies, and that she was "very active in marketing and arranging for a contract with the South Carolina National Guard" which TDG was eventually awarded. *Id.* at 434. TDG contested some of this evidence, but also noted that "Ms. Sumpter has a contract to provide marketing services for TDG," which the company contended explains some of the marketing activities.[8] *Id.* at 111. The SBA responded, in a conclusory fashion, that "[t]he 'consultant contract' appears to provide cover for Ms. Sumpter's involvement," and that the agency did not believe the companies' "real working relationship and intentions in having Ms. Sumpter contact SDCO . . . were properly disclosed." *Id.* at 400.

The SBA also notes that it cautioned Ms. Sumpter on at least one occasion that her actions on behalf of TDG were creating an appearance that she owned the company. *Id.* at 434. That instance arose when a Marketing Specialist for the Minority Business Development Agency ("MBDA") Business Center sent an e-mail to an employee of Fort Jackson military base thanking the employee for "taking your time to speak recently with Ms. Diane Sumpter regarding The DESA Group's (TDG) ground maintenance services." *Id.* at 319. At least at the time, DESA in fact operated the MBDA Business Center in Columbia, South Carolina. *See id.* at

---

[8] Even the SBA's own December 2011 field report indicates that the agency anticipated some form of marketing assistance from DESA. After indicating "Yes" to whether the firm is "adequately served by trained sales representatives," the field report states that the firm's "informal Mentor—DESA, Inc. is able to provide any assistance." A.R. 349.

320 (signature block stating "operated by DESA, Inc.").[9]  Ms. Fleshman responded to the SBA's allegation by acknowledging the SBA's caution, but explaining, in part, that MBDA Business Center "markets for ALL of its clients." *Id.* at 112.  The SBA rejected this portion of the explanation stating that "[t]here was no reference to representing MBEC clients, only TDG," and concluding that, because the subject line stated "From Diane Sumpter: The DESA Group (TDG)," the message "clearly puts Ms. Sumpter acting as an official of TDG." *Id.* at 403.  Yet, the e-mail itself was signed by an employee of, and includes the signature block of, the MBDA Business Center.  *See id.* at 320.  At the very least, the SBA's response failed to grapple with that alternative explanation by dismissing it out of hand, despite the clear reference to the MBDA in the e-mail.

Given the numerous apparent discrepancies in the record and the vague, conclusory nature of much of the evidence the SBA has offered, the Court has serious doubts that this factual record suffices to provide the substantial evidence necessary to support the SBA's conclusion that Ms. Sumpter played an outsized role in TDG's marketing activities.  *See AT&T Wireless Servs., Inc. v. FCC*, 270 F.3d 959, 968 (D.C. Cir. 2001) ("Conclusory explanations for matters involving a central factual dispute where there is considerable evidence in conflict do not suffice to meet the deferential standards of our review."); *see also Lakeland Bus Lines*, 347 F.3d at 962 (explaining that substantial evidence review must "take into account whatever in the record fairly detracts from [the evidence's] weight," and that a court "may not find substantial evidence 'merely on the basis of evidence which in and of itself justified [the agency's decision], without taking into account contradictory evidence or evidence from which conflicting

---

[9] Ms. Fleshman's response in some instances refers to the "Minority Business Enterprise Center" or "MBEC."  *See* A.R. 107.  The Court understands these terms to reference the MBDA Business Center.

inferences could be drawn'" (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951))).

In any event, even accepting that Ms. Sumpter attended TDG's meetings with the SBA, was active in those conversations, and performed marketing services for TDG—whether as a contractor or, in some cases, in her capacity through the MBDA—the SBA has failed to connect those facts to its conclusion that Ms. Fleshman was unable to exercise independent business judgment over TDG without "great economic risk." 13 C.F.R. § 124.106(g)(4).  Perhaps the firm's ability to market itself is sufficiently critical to its survival that the SBA believes Ms. Sumpter's role inhibits Ms. Fleshman's ability to run the company.  If that is the agency's position, however, the agency has not explained why the connections it has identified support that conclusion.  There are some indications in the February 2013 field report under a section entitled "marketing" that the SBA had concerns that the firm was being marketed in a way that led it to probably be "viewed as part of DESA rather than 'The Desa Group.'" A.R. 356–57. Yet, in that very same document the SBA also indicated in the same sentence that the firm "has a good marketing plan." *Id.* at 356.  In sum, neither the termination letters nor the agency's response to Ms. Fleshman's letter contesting the agency's assertions connect the firm's marketing capacities or Ms. Fleshman's attendance in meetings directly to TDG's perceived inability to exercise its own independent business judgment.

Third, the ALJ noted that "DESA was responsible for almost 40% of [TDG's] revenues in 2010." *Id.* at 384.  As already explained, TDG provides human resource consulting services for DESA, and therefore brings in revenue from DESA pursuant to that contractual arrangement. TDG contends that this figure has fallen to 16% in 2012 and, therefore, that the 2010 figure is

"entirely of no relevance."[10]  Pl.'s Mem. Supp. at 16.  The Court disagrees.  To the extent the revenues received from an associated company during the year the firm entered the Section 8(a) program were higher than anticipated, that information would be relevant to determining whether the organization was properly admitted into the program in the first place.

Yet, while the Court agrees with the SBA that the level of revenue TDG receives from a company controlled by Ms. Sumpter *might* support a finding of dependence that prohibited TDG from exercising its own independent business judgment without great economic risk, the agency has again failed to explain how those facts support its conclusion.  For one thing, the mere fact that DESA pays for TDG's services does not necessarily indicate that it is able to assert control over *how* TDG runs its business or the business judgments TDG or Ms. Fleshman make in doing so.  The regulation the SBA has invoked, itself, does not state that all "business relationships" are indicative of control.  Instead, it states that control by a non-disadvantaged individual will be found where there exist "[b]usiness relationships . . . which cause such dependence that the

---

[10] While both parties accept this figure in their briefing and do not question its accuracy or relevance, TDG appears to be mixing apples and oranges by relying on the 16% figure, (although the record is, yet again, not entirely clairvoyant).  TDG derives this figure from the fact that DESA performed only 16% of the work in 2012 as a subcontractor on a contract TDG was awarded.  *See* A.R. 147, 108.  But the 40% of revenues comparison point from 2010 that TDG references was based on work TDG had performed as a human resources consultant for DESA, who is one of TDG's clients.  *Id.* at 103, 105, 195.  That type of direct revenue seems different in kind to the work DESA performed *for TDG* as a subcontractor.  Moreover, the record contains invoices from 2011 and 2012 indicating that TDG continues to perform this human resources consulting work and that DESA continues to pay TDG roughly $10,000 per month throughout 2011 and 2012.  *See* A.R. 234–44, 268–74.  This implies that any subcontract work was not TDG's sole source of revenue from DESA, although the percentage of revenues presumably would have still decreased in light of TDG's increased revenues in 2011 and 2012.  *See* A.R. 115 (reproducing annual revenues).  Indeed, elsewhere in its opening brief, TDG does seem to claim that this continued flow of payments "would be less than 10% of TDG's revenues in 2012," which indicates that it remains a separate source of revenue.  Pl.'s Mem. Supp. at 16.  Regardless, and these discrepancies aside, the Court ultimately concludes that the SBA has not rationally explained why any revenues from DESA limited TDG's ability to exercise its own independent business judgment.

applicant or Participant cannot exercise independent business judgment without great economic risk." 13 C.F.R. § 124.106.(g)(4)  Yet, the implicit, unexplained assumption that *any* contractual relationship inevitably indicates that DESA or Ms. Sumpter's control over TDG appears to be all the agency relied upon.  The SBA claims that the 40% figure provided the agency with "a rational basis to determine that DESA was and remains a significant contributor toward TDG's revenues and, when coupled with the other factors identified by SBA, that TDG is unduly dependent on DESA." Def.'s Mem. Supp. at 20.

In addition, although the ALJ relied upon the fact that "[b]oth companies act or have acted as subcontractors for the other company," A.R. 383, the SBA has not responded in its briefing here to TDG's claim that there is nothing inherently problematic with TDG contracting with DESA, *see* Pl.'s Opp'n & Reply at 23 n.7, ECF No. 26-2 (noting the SBA's failure to contest this point).[11]  But if there is no inherent impropriety in TDG's hiring DESA as a subcontractor, or DESA hiring TDG to provide human resource services, then it is difficult to understand, without some explanation, why the revenues TDG received from any such

---

[11] The agency's assertions during the administrative proceedings similarly show that the SBA simply stated its conclusion (again, without explanation) that the existence of a contract indicated that Ms. Sumpter drove TDG's business.  *See, e.g.*, A.R. 400 ("SBA disputes the fact that there is nothing improper in TDG having a 'consultant' contract with [DESA].  The 'consultant contract' appears to provide cover for Ms. Sumpter's involvement.").  It does not appear, so far as the Court can tell, that the SBA has ever claimed that contracting with a non-disadvantaged entity, alone, violated any regulation or requirement of the Section 8(a) program.  At one point the agency did claim that "[DESA] was operating as a subcontractor, which represents an affiliation that would require approval by SBA." *Id.* at 397; *see also id.* at 394 ("[DESA]'s subcontracting for TDG represents a substantial affiliation concern and reliance by TDG on [DESA].").  But that conclusion contained no citation to a regulation requiring such approval, and was included in a section of the SBA's response concerning the requirement that a firm obtain written approval from SBA for changes in ownership, business structure, management, or control.  This suggests that the "approval" the SBA was concerned about was the approval of a *management* change it believed was suggested by the subcontract, not the approval of the subcontracting arrangement, itself.

arrangements indicate that the firm is unable to exercise independent business judgment without

great economic risk.  For the same reasons, the SBA has not provided a rational connection

between the ALJ's fourth contention—that DESA was paying TDG "between $7,000 and

$10,000 per month from 2010 to 2012," A.R. 384—and the SBA's conclusion that TDG is

unduly dependent on DESA.[12]

Moreover, TDG expressly represented at the time it applied for the Section 8(a) program

that revenues from DESA during the 2010 calendar year had thus far amounted to "slightly less

than 25% of [the] company's revenues."  A.R. 195.  Despite that admission, TDG was admitted

to the program.  *See id.* at 140.  The SBA has failed to indicate why the 15% uptick changes its

analysis of whether TDG is able to exercise independent business judgment.  And the agency's

claim now that "[e]ven based on the 2012 figures, DESA remains a significant client, accounting

for sixteen percent of revenues," Def.'s Mem. Supp. at 20, is particularly unpersuasive in light of

the SBA's original approval of DESA's application on the assumption the firm was receiving an

even higher percentage of its revenues (25%) from DESA.

Finally, the ALJ concluded that, although TDG and the SBA debated whether Ms.

Sumpter was acting as a marketing contractor for TDG or one of its managers, regardless of the

---

[12] The Court disagrees, however, with TDG's argument that the ALJ's invocation of this fact flies in the face of its rejection a page earlier of the SBA's claim that these payments constituted earnings DESA paid to Ms. Fleshman.  *See* Pl.'s Mem. Supp. at 17–18.  The ALJ did conclude that the SBA's contention was "based on inaccurate or unsupported assumptions" because the funds were payments made to TDG pursuant to its contract with DESA, and that they "are not Ms. Fleshman's personal income."  A.R. 383.  Accordingly, the ALJ found that "the time spent executing the DESA contract is time spent on [TDG]'s affairs and must be counted when determining whether Ms. Fleshman devotes full time to [TDG]."  *Id.* (emphasis in original).  But when he invoked those payments a page later, the ALJ relied on them in a different way: to show "evidence of significant interconnectedness between the two companies."  *Id.* at 383–84.  The Court does not find it inherently inconsistent to rely on those payments to show some degree of connection between the two firms, notwithstanding the ALJ's conclusion that they did not demonstrate Ms. Fleshman's direct employment by DESA.

answer "it is clear that Ms. Sumpter plays a critical role in [TDG]'s success." A.R. 383–84.
TDG claims that this rationale is conclusory, and runs counter to the evidence in the record—
reiterating many of its responses to the other factors cited above. *See* Pl.'s Mem. Supp. at 15–16.
The SBA does not rely on this factor as a stand-alone argument, but simply claims that it "is
supported by all of the factors identified in the Termination Letter and cited in the OHA
decision." Def.'s Mem. Supp. at 18. Therefore, this factor simply collapses back into the
parties' other arguments recited above.

   As the ALJ stated when rejecting the SBA's conclusion that Ms. Fleshman failed to
maintain full-time day-to-day control of TDG: "[i]n many instances, the Termination Letter
identified a real or perceived business connection between [TDG] and DESA, then made a
conclusory statement that the connection was indicative of shared management, improper
reliance, or lack of full-time dedication to [TDG]. It rarely attempted to explain how the
evidence supported the conclusion." A.R. 382. In the Court's view, the SBA and ALJ's
determination that the connection between TDG and DESA was indicative of such dependence
that TDG was unable to exercise independent business judgment without great economic risk
suffers from the very same infirmity. The agency has identified several contacts or connections
between TDG and DESA. But under the regulation the SBA has invoked here, mere contacts or
business relationships alone are insufficient to show control; the agency must establish that those
relationships "cause such dependence" that TDG "cannot exercise independent business
judgment without great economic risk." 13 C.F.R. § 124.106(g)(4). The SBA has done no more
than conclusorily state that the contacts here equate to the level of dependence necessary to show
that Ms. Sumpter or DESA controls TDG. Therefore, the Court finds the SBA's determination
arbitrary and capricious because the agency has not articulated "'a rational connection between

the facts found and the choice made,'" and has "failed to consider an important aspect of the problem." *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43 (quoting *Burlington Truck Lines*, 371 U.S. at 168).[13]

*    *    *

In its memorandum, TDG requests that the Court "order the SBA to immediately accept TDG back into the 8(a) Program" and add additional time to compensate for the time, if any, it was precluded from the program. *See* Pl.'s Mem. Supp. at 19. Yet, if "the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1353 (D.C. Cir. 2014) (noting that remand is the "usual remedy"). The Court sees no reason to depart from that typical remedy in this case. Given the numerous connections between TDG and DESA, and the hotline complaint that the SBA received, the agency had reason to be suspicious that TDG was dependent on

---

[13] Because the Court grants summary judgment to TDG on alternative grounds, it need not determine whether the SBA failed to "act in a timely manner in processing early graduation and termination actions," 13 C.F.R. § 124.304(c), when the agency took over a year to respond to Ms. Fleshman's rebuttal of the notice of intent to terminate. The Court notes, however, that TDG provides no citation to case law or analogous regulations in arguing that this time period flouts the regulation. Nor does TDG provide any authority indicating whether the language is mandatory or aspirational, or supporting its claim that the proper remedy would be to order TDG accepted back into the program. *See* Pl.'s Mem. Supp. at 19, Pl.'s Opp'n & Reply at 24–26. As the SBA points out, the cases TDG cites involve specifically enumerated statutory deadlines and do not discuss the deadlines applicable to termination proceedings or the more open ended "timely manner" language contained in section 124.304(c). *See* Def.'s Reply at 15, ECF No. 28. At the same time, however, the SBA also fails to cite any case law or authority to support its claim that it did not violate the regulation when it waited over one year to issue a response. *See* Def.'s Mem. Supp. at 21–22.

DESA or Ms. Sumpter.  The agency's investigation relied on numerous erroneous assumptions, however, and the portions of the agency's determination presented to this Court rest on unsupported conclusions, not substantial evidence.  But the Court does not conclude that the agency will be unable to make an appropriate case that the connections between TDG and DESA indicate inter-dependence.  Thus, the Court will not prejudge the merits of any decision the SBA makes on remand based on a different record.

## V.  CONCLUSION

For the foregoing reasons, Plaintiff's motion for summary judgment (ECF No. 14) is **GRANTED**, and Defendant's motion for summary judgment (ECF No. 20) is **DENIED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  May 26, 2016                                RUDOLPH CONTRERAS
                                                    United States District Judge